UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

ROBERT E. JOHNSON,           )
                             )
            Plaintiff,       )
                             )
        vs.                  )        No. 4:06-CV-1031 (CEJ)
                             )
MICHAEL J. ASTRUE[1],        )
Commissioner of Social       )
Security,                    )
                             )
            Defendant.       )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

## I.  Procedural History

On September 14, 2004, plaintiff Robert E. Johnson filed
applications for a period of disability and disability benefits
under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et
seq.*, (Tr. 159-61), and for supplemental security income (SSI)
benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* (Tr.
73-75), with an alleged onset date of August 2, 2004.  After
plaintiff's applications were denied on initial consideration (Tr.
68-72, 126-30), he requested a hearing from an Administrative Law
Judge (ALJ). (Tr. 64).

---

[1]Michael J. Astrue became the Commissioner of Social
Security on January 20, 2007.  Pursuant to Rule 25(d)(1) of the
Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted, therefore, for Commissioner Jo Anne B. Barnhart as
Defendant in this suit.  No further action need be taken to
continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g).

The hearing was held on November 30, 2005. Plaintiff was represented by counsel. (Tr. 22-48). The ALJ issued a decision on January 22, 2006, denying plaintiff's claims. (Tr. 10-21). The Appeals Council denied plaintiff's request for review on June 1, 2006. (Tr. 4-8). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

Plaintiff was the sole witness at the November 30, 2005 hearing. He was then 46 years old and resided with his wife and one son, age 18. (Tr. 27). He completed the 12th grade and served in the Marine Corps. Id.

Plaintiff identified his disabling conditions as uncontrolled high blood pressure, diabetes, impaired vision, and chest pains. (Tr. 30, 34-35). He testified that he had been hospitalized "several times" for symptoms associated with high blood pressure, including dizziness, headaches, chest pains and shortness of breath. (Tr. 31). Despite medication, he testified, the dizziness continued on a constant basis. Plaintiff rated his dizziness, on a scale of 1 to 10, at 4 or 5 when the medication was effective. At least once each day, however, the dizziness was more extreme, requiring him to lie down. (Tr. 32-33). About two years before the hearing, he began experiencing chest pains, which he thought were linked with elevations in his blood pressure. He described the pains as feeling like someone was pushing down on his chest or trying to give him CPR. The pains occurred most frequently at three or four o'clock in the morning. (Tr. 34). Plaintiff

-2-

testified that his diabetes affected his vision, for which he wears corrective lenses, and caused his feet to swell painfully when he stood. Medication was ineffective in treating this condition. (Tr. 38).

Plaintiff testified that he sought medical insurance after his employment was terminated but it was too expensive. He eventually received his medical care from the John C. Murphy "free clinic," but in the interval, he could not afford his medications. (Tr. 37). At the time of the hearing, he was taking eight or nine pills three times per day. (Tr. 42). Plaintiff described his sleep as "very not good," due to pain in his feet and difficulties with breathing. He estimated that he slept four to six hours per night; he lay down for about two-and-a-half hours each day. (Tr. 43).

Plaintiff testified that he drove to a nearby store approximately two times a week. He stopped visiting friends and relatives a year before the hearing because he did not feel well. He went to church when he felt up to it, and estimated that he had missed going fifteen or twenty times since January 2005. (Tr. 39-40). He testified that he went grocery shopping with his wife about twice a month. (Tr. 42). He attended his son's high school graduation ceremony and a choir performance. (Tr. 44).

Plaintiff testified that he is able to take care of his personal needs, though showering makes him light-headed and he has to rest briefly before dressing himself. He testified that he does not engage in any outdoor activity like fishing or hunting and does not do lawn or garden care. He testified that he did laundry,

although he frequently required his son's help to carry the laundry basket. (Tr. 41). He prepared meals twice per week and "sometimes" washed dishes. He never used the vacuum. (Tr. 42).

Plaintiff testified that he can lift a gallon of milk but would have to strain to lift a ten-pound bag of sugar. He can sit for thirty minutes without standing and can stand for about twenty minutes at a time. He can walk a distance of about half a block before getting tired or having chest pains. (Tr. 44).

Plaintiff was last employed as a warehouse worker in August 2004. (Tr. 28). He previously worked as supervisor at a warehouse and as a supervisor for a security company. (Tr. 45-46). He held a number of temporary jobs in which he picked up trash, cooked, and did janitorial work. (Tr. 46-47).

Plaintiff completed a "Function Report" on September 22, 2004. (Tr. 179-86). When asked to describe his daily activities, plaintiff wrote that he watched the news upon waking and then tried to go for a short walk, followed by rest. He watched television, read, and did some ironing while sitting. If he felt well enough, he prepared a meal or took another short walk. (Tr. 179). Plaintiff indicated that, due to his blurred vision, he needed assistance reading medication labels. (Tr. 181). He indicated that he did not drive alone "due to constant dizziness." (Tr. 182). Plaintiff stated that his conditions affected his ability to lift, bend, stand, and walk. In response to a question regarding how well he understood spoken instructions, plaintiff wrote that he could not "always remember. Better if instructions are written."

(Tr. 184). He denied having problems with authority figures or a history of job termination due to difficulties getting along with others. Stress caused his blood pressure to "skyrocket," which in turn caused his speech to slur and his mobility to become impaired. (Tr. 185).

On July 20, 2005, plaintiff completed questionnaires regarding recent medical treatment and medications. (Tr. 173-78). He indicated that he had been hospitalized since his last case review in November 2004. (Tr. 174). He was prescribed the following medications for the treatment of Type II diabetes and hypertension: Melformin, Glipizide, Triamterene,[2] Lisinopril,[3] Norvasc,[4] Cozaar,[5] Aspirin, Coreg,[6] and Cardizem.[7] (Tr. 176).

Plaintiff served in the United States Marine Corps in the military police from 1978 through 1982. (Tr. 178). He worked in

---

[2]Triamterene is a diuretic/antihypertensive drug. See Phys. Desk Ref. 1423 (61st ed. 2007).

[3]Lisinopril is indicated for the treatment of hypertension. See Phys. Desk Ref. 2053 (61st ed. 2007).

[4]Norvasc is indicated for the treatment of hypertension and coronary artery disease. See Phys. Desk Ref. 2546 (61st ed. 2007).

[5]Cozaar is indicated to reduce the risk of stroke in patients with hypertension and left ventricular hypertrophy, although there is evidence that the benefit does not apply to Black patients. See Phys. Desk Ref. 1937 (61st ed. 2007).

[6]Coreg is indicate for treatment of mild to severe heart failure of ischemic or cardiomyopathic origin and for treatment of essential hypertension. See Phys. Desk Ref. 1416 (61st ed. 2007).

[7]Cardizem is indicated for treatment of hypertension. See Phys. Desk Ref. 1729 (61st ed. 2007).

the maintenance department of a nursing home between 1982 and 1984. From 1984 through 2000 he provided security and protection service for a security company. He held a number of temporary jobs from 2000 to 2002, doing manual labor and warehouse jobs. From June 2002 until August 2004, he worked as a production worker and forklift driver for a warehouse and moving company. (Tr. 177). He went on medical leave in August 2004. (Tr. 498). On January 28, 2005, plaintiff's employer informed him that he had exhausted his leave benefits under the Family and Medical Leave Act[8], and that his employment and benefits would terminate on January 31, 2005. (Tr. 165).

### III. Medical Evidence

Plaintiff saw Edward Leahy, M.D., on an outpatient basis on July 11, July 18, and July 25, 2003. He was diagnosed with high blood pressure and diabetes mellitus. He complained of pain and numbness in his feet for which Dr. Leahy provided samples of Neurontin.[9] On all three visits, plaintiff's blood pressure was significantly elevated and his weight was 257 pounds. On July 25, 2003, plaintiff reported that he had seen the dietician. (Tr. 557).

---

[8] 29 U.S.C. § 2601, et seq.

[9] Neurontin is indicated for the management of postherpetic neuralgia in adults. See Phys. Desk Ref. 2489 (61st ed. 2007).

On August 29, 2003, sonograms of the kidneys were completed to investigate hematuria.[10]  There was no evidence of any mass, cyst, dilation, or calcification.  (Tr. 677).  Plaintiff had an office visit with Dr. Leahy on September 15, 2003.  His weight and blood pressure remained high.  (Tr. 556).

Plaintiff was seen in the Emergency Department at DePaul Health Center on December 27, 2003, for treatment of symptoms due to a spider bite.  (Tr. 660-76).

On February 13, 2004, Dr. Leahy referred plaintiff for a cardiac stress test.  (Tr. 556).  The test was completed on February 18, 2004, to investigate plaintiff's complaints of increasing chest pain and shortness of breath.  He demonstrated poor R-wave progression and lateral T-wave inversions at rest.  He experienced mild chest pain with exertion.  No EKG changes diagnostic of ischemia were noted; he did experience a hypertensive response to exercise.  (Tr. 650).  A cardiac catheterization was also completed on February 18, 2004, to investigate hypertension and unstable anginal symptoms.  Left ventricular functioning was normal, with no evidence of mitral regurgitation or gradient across the aortic valve.  Minimal functional irregularities were found in the left anterior descending artery.  (Tr. 651-52).

On February 21, 2004, plaintiff went to the DePaul Health Center Emergency Department after suffering a headache for four days.  (Tr. 625).  He reported that he experienced sharp pains on

---

[10]The presence of blood or red blood cells in the urine. Stedman's Med. Dict. 798 (27th ed. 2000).

the left side of his head and neck. He went to the emergency room after the pain woke him up at 3:00 a.m. He reported blurred vision and had high blood pressure on admission. (Tr. 629). He expressed a fear that he was going to die. (Tr. 633). The clinical assessment was hypertensive emergency. (Tr. 630). His vital signs, physical examination, and laboratory results were unremarkable. (Tr. 625). A CAT scan of the brain was unremarkable. Plaintiff described his headaches as lingering and very intense and unlike other headaches he had previously experienced. He had no specific hemisoma, visual disturbance, speech disturbance or motor deficits. (Tr. 626). A chest x-ray was negative for evidence of active cardiopulmonary disease. (Tr. 644). An echocardiogram indicated mild left ventricular hypertrophy and trace mitral and pulmonic regurgitation. (Tr. 637). A CT scan of the brain indicated no intracranial mass or midline shift; there was no evidence of hemorrhage. (Tr. 645). An MRI of the brain showed chronic-appearing small vessel ischemic[11] changes in white matter but was otherwise unremarkable. (Tr. 643). A left temporal artery biopsy was performed on February 25, 2004. (Tr. 628). Microscopic examination indicated no morphologic abnormalities and no inflammation or significant atherosclerotic changes. Focal minimal separation of intima from media was noted. (Tr. 646). Plaintiff was discharged from the hospital on February

[11]Ischemia is defined as "[l]ocal anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply." Stedman's Med. Dict. 894 (26th ed. 1995).

25, 2004, with diagnoses of poorly-controlled diabetes, headache, and hypertension.  Plaintiff followed up with Dr. Leahy on March 1, April 5, and May 7, 2004.  (Tr. 555-56).  He was released to work on May 10, 2004, with a restriction on working to extreme fatigue. (Tr. 553).

Plaintiff was next seen at the DePaul Health Center Emergency Department on May 17, 2004, with swelling of the jaw and face due to dental pain.  (Tr. 613-21).  He was provided pain medication and an antibiotic and referred to a dentist for further treatment. (Tr. 617).

On May 24, 2004, plaintiff was again admitted to DePaul Health Center after appearing at the Emergency Department with complaints of headache and visual changes.  He reported that he had been without medication for the previous two weeks.  He denied shortness of breath and chest pain.  (Tr. 601).  An admission note states that "EMS found [plaintiff] to be very hypertensive."  (Tr. 607). A CT brain scan showed no evidence of hemorrhage or mass.  (Tr. 611).  He was discharged the following day with a diagnosis of hypertensive emergency.  (Tr. 602).

Plaintiff returned to the emergency department on June 21, 2004, with ear pain and elevated blood pressure; he asked to have his blood sugar checked.  (Tr. 595).  He was provided with pain medication and an antibiotic. (Tr. 589).  He followed up with Dr. Leahy on July 12, 2004; his blood pressure was again elevated. (Tr. 552).

Plaintiff was admitted to the DePaul Health Center again on July 21, 2004. He presented at the Emergency Department stating that he had been working in the heat when he experienced dizziness, slurred speech and chest pain. The clinical impression was heat exhaustion. (Tr. 576-77). Plaintiff also reported having a headache. His EKG, chest x-ray, and cardiac lab tests were all normal. (Tr. 583). The findings of an MRI of the brain were consistent with the previous MRI. (Tr. 563, 565). A CT scan of the brain was unremarkable. (Tr. 586). Although plaintiff reported that he had not missed any doses of his medication, his blood pressure was noted to be "occasionally elevated." (Tr. 577). Plaintiff's diagnoses on discharge were malignant hypertension, uncontrolled Type II diabetes, and possible TIA. (Tr. 565).

Dr. Leahy placed plaintiff on leave from work on August 1, 2004, "until further notice." (Tr. 499). Plaintiff was seen by Dr. Leahy on August 9, 2004. (Tr. 552). Plaintiff reported to the Emergency Department at DePaul Health Center on August 12, 2004. (Tr. 559).[12] He was anxious and hypertensive upon admission. Id. A chest x-ray indicated cardiomegaly.[13] (Tr. 366). On August 18, 2004, plaintiff saw Dr. Leahy, who prescribed Coreg. (Tr. 526, 551). A gallbladder sonogram was completed on August 20, 2004, in response to complaints of right upper quadrant pain. The gallbladder and liver showed no abnormality. (Tr. 361). Plaintiff

---

[12]The transcript contains only page 2 of a four-page report.

[13]Enlargement of the heart. Stedman's Med. Dict. 281 (26th ed. 1995).

was seen by Dr. Leahy for follow-up on September 13 and October 4, 2004. Dr. Leahy referred plaintiff to a cardiologist for blood-pressure lowering assistance. (Tr. 526).

On October 28, 2004, plaintiff was transported by ambulance to the DePaul Health Center Emergency Department. He complained of chest pain that was worsened by movement and relieved by rest. He had no nausea, vomiting or difficulty breathing. He was discharged with instructions not to work. (Tr. 337-39). Plaintiff had follow-up appointments with Dr. Leahy on November 8, November 22, December 6, December 20, and December 29, 2004. His blood pressure was elevated on each visit. (Tr. 524-25).

Plaintiff was seen in the Emergency Department at DePaul Health Center again on January 23, 2005, complaining of a sore throat of two weeks' duration; he was prescribed antibiotics and discharged. (Tr. 317).

Usman Qayyum, M.D., and Ann Davis, R.N., of Cardiology Diagnostics, Ltd., completed an evaluation of plaintiff on February 1, 2005. Plaintiff reported that he experienced chest "discomfort" which he described as a sharp pain that occurred in the left sternal border. The discomfort occurred while he was resting, not during exertion, and took his breath away. It was accompanied by diaphoresis,[14] nausea and palpitations and was followed by dizziness. The pain lasted about three minutes and occurred about twice per month. (Tr. 539). He additionally complained of

_____

[14]Perspiration. Stedman's Med. Dict. 475 (26th ed. 1995).

decreased appetite, fatigue and possible sleep apnea. He reported that he had headaches about three times per week, which he treated with aspirin. (Tr. 540). An EKG completed at the time of examination yielded wave changes suggestive of ischemia. The diagnostic impressions were listed as uncontrolled hypertension, poorly-controlled diabetes, and an abnormal EKG. (Tr. 541).

Dr. Qayyam ordered an echocardiogram with Doppler, which was completed on February 15, 2005. The following conditions were detected: left atrial enlargement, left ventricular hypertrophy with normal left ventricular systolic function, hypokinetic inferior base, mitral inflow compatible with mild disastolic dysfunction, trace of mitral insufficiency, mild tricuspid insufficiency, and pulmonary insufficiency. There was no pericardial effusion. (Tr. 537). An MRA of the abdomen completed the same day showed left renal artery origin mild stenosis[15] and thirty percent stenosis of the proximal celiac axis. (Tr. 538).

Plaintiff had a new-patient visit at the John C. Murphy Health Center on April 4, 2005. He described himself as diabetic and hypertensive. He stated that he had lost his insurance and had been without medication for three months. He reported that he did not drink alcohol or smoke cigarettes. (Tr. 505). Plaintiff was prescribed Lisinopril, Triamterene-HCTZ, Norvasc, and Clonidine

---

[15]A stricture of any canal. <u>Stedman's Med. Dict.</u> 1673 (26th ed. 1995).

HCl.[16]   (Tr. 506).  He was diagnosed with hypertension (benign), obesity, and diabetes mellitus.  (Tr. 506-07).

Plaintiff returned to the John C. Murphy Health Center for a scheduled follow-up on April 11, 2005.  He complained of fatigue that he attributed to medication.  His medications were reviewed. (Tr. 503-04).

Plaintiff returned to the DePaul Health Center Emergency Department on April 19, 2005, complaining of vomiting, diarrhea, and cramps.  (Tr. 532).  An EKG and x-rays of the chest and abdomen were unremarkable.  (Tr. 295-98).  Plaintiff was diagnosed with gastroenteritis, attributed to possible food poisoning; he had mild hyperglycemia.  (Tr. 289-90; 532-33).

Plaintiff appeared for a scheduled follow-up appointment at the John C. Murphy Health Center on April 25, 2005.  He reported that he had recovered from the bout of food poisoning.  He was prescribed Cozaar and aspirin and referred to an eye clinic.  (Tr. 501).

On May 19, 2005, plaintiff received treatment for abdominal pain at the DePaul Emergency Department.  He was directed to take Mylanta and to receive follow-up care from the John C. Murphy Health Clinic.  (Tr. 527).

Plaintiff had office visits with La Vert Morrow, M.D., on May 31, 2005 (Tr. 247), June 8, 2005 (Tr. 245), July 13, 2005 (Tr. 244), July 20, 2005 (Tr. 243), and July 27, 2005 (Tr. 242).  Dr.

---

[16]Clonidine is indicated for treatment of hypertension.  <u>See</u> <u>Phys. Desk Ref.</u> 843 (61st ed. 2007).

Morrow ordered an upper GI, which was completed on May 31, 2005, at Forest Park Hospital. The test revealed evidence of chronic peptic ulcer disease with multiple old ulcerations and post-inflammatory scarring and secondary cicatrization.[17] No active ulcers were identified. (Tr. 252).

Plaintiff was admitted to Forest Park Hospital on August 16, 2005. He complained that he had experienced chest pain, shortness of breath, and a headache for the prior four days. He described the chest pain as sharp and radiating to the left shoulder, arm and jaw, and with an intensity of 8 on a 10-point scale. He also reported shortness of breath upon walking. He complained of paroxysmal nocturnal dyspnea[18] and orthopnea[19] with night sweats. A chest x-ray showed increased pulmonary vascular congestion and an EKG showed T-wave inversions; he had elevated cardiac enzymes. He was discharged on August 17, 2005, with diagnoses of chest pain secondary to coronary artery disease, hypertension, diabetes mellitus, peptic ulcer disease, and gout. (Tr. 258-59). His medications on discharge were Prevacid,[20] Coreg, Metformin,

_____

[17]The process of scar formation. Stedman's Med. Dict. 340 (26th ed. 1995).

[18]Shortness of breath appearing suddenly at night caused by pulmonary congestion with or without edema that results from left-sided heart failure following immobilization of fluid from dependent areas after lying down. Stedman's Med. Dict. 535 (26th ed. 1995).

[19]Discomfort in breathing brought on by or aggravated by lying flat. Stedman's Med. Dict. 1263 (26th ed. 1995).

[20]Prevacid is prescribed for the treatment of duodenal ulcer, gastric ulcer, gastroesophageal reflux disease, erosive esophagitis and pathological hypersecretory conditions. See

Glipizide, Tricor,[21] Lisinopril, Cardizem, Traimterene HCl, and Avandia.[22] Plaintiff had a follow-up visit with Dr. Morrow on August 31, 2005. (Tr. 241).

Plaintiff was hospitalized again on September 5, 2005, with complaints of vertigo, nausea, headache, and elevated blood pressure. He again complained of a headache of several days' duration, that reached an intensity of 10 on a 10-point scale. He experienced vertigo whenever he tried to get up and nausea upon drinking fluids. He had experienced some weakness of the left shoulder, but that was not present on admission. (Tr. 226). He reported slurred speech and weakness in the left upper extremity. (Tr. 235). He had experienced some sharp, shooting chest pains before admission. (Tr. 230). Interviews indicated that plaintiff may have been inadvertently noncompliant with his blood pressure medications in the past because he did not have insurance. It was opined that physicians may have increased his dosages in a mistaken belief that the medications were ineffective. During this hospital stay, plaintiff's dosages were reduced with good effect on the regulation of his blood pressure. His reports of dizziness appeared to be unrelated to his blood pressure. (Tr. 228). An MRI of the brain disclosed mild chronic small vessel ischemic changes.

_____

Phys. Desk Ref. 3274 (61st ed. 2007).

[21]Tricor is used for treatment of high cholesterol. See Phys. Desk Ref. 528 (61st ed. 2007).

[22]Avandia is an oral antidiabetic agent used in management of Type 2 diabetes mellitus. See Phys. Desk Ref. 1384 (61st ed. 2007).

(Tr. 254). A Doppler examination of the carotid arteries revealed arteriosclerotic changes but no stenosis. (Tr. 255). An ultrasound of the kidneys indicated possible nephritis.[23] (Tr. 256). Plaintiff was discharged in stable condition on September 10, 2005. He had follow-up visits with Dr. Morrow on September 19, and October 3, 2005. Notwithstanding the correction of his medications, plaintiff's blood pressure remained elevated. (Tr. 240-41).

## IV. The ALJ's Decision

The ALJ determined at the fourth step of the five-step analysis that plaintiff could return to his past relevant work as a security guard supervisor and thus was not disabled. The ALJ made the following findings in support of this conclusion:

1.  Plaintiff met the non-disability requirements for a period of disability and disability insurance benefits through December 31, 2009. (Tr. 20).

2.  Plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability, August 2, 2004. (Tr. 20, 15, 13).

3.  Plaintiff had the medically determinable severe impairments of diabetes mellitus, hypertension, mild left ventricular hypertrophy, cardiomegaly, left kidney nephritis, and mild stenosis of the left renal artery. (Tr. 20, 15).

4.  Plaintiff did not have an impairment or combination of impairments listed in, or medically equivalent to, one listed in Appendix 1, Subpart P, Regulation No. 4. (Tr. 20).

5.  Plaintiff's allegations regarding his limitations were not credible. (Tr. 20).

---

[23]Inflammation of the kidneys. Stedman's Med. Dict. 1183 (26th ed. 1995).

6.   Plaintiff retained the residual functional capacity (RFC) to perform light exertional work.  Light exertional work requires a maximum lifting of 20 pounds, frequent lifting of 10 pounds, and standing or walking for six out of eight hours per day.  (Tr. 20).

7.   Plaintiff was able to perform his past relevant work as a security guard supervisor, as it is generally performed in the national economy; as plaintiff described the work, it is not precluded by his RFC.  (Tr. 20).

8.   Plaintiff was not under a disability at any time relevant to the decision.  (Tr. 20).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings."  <u>Nimick v. Secretary of Health and Human Serv.</u> 887 F.2d 864 (8th Cir. 1989).  The ALJ first determines

whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145,

1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.    The ALJ's credibility findings;

2.    the plaintiff's vocational factors;

3.    the medical evidence;

4.    the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.    third-party corroboration of the plaintiff's impairments; and

6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

**B.    Plaintiff's Allegations of Error**

Plaintiff's appeal raises the following issues: (1) whether the ALJ properly considered all of plaintiff's medical conditions in making a determination of plaintiff's residual functional

capacity; (2) whether the ALJ properly considered plaintiff's subjective complaints under the Polaski standards; (3) whether the ALJ properly considered plaintiff's past relevant work; and (4) whether the ALJ erred in failing to obtain the testimony of a vocational expert.

### 1. The ALJ's assessment of plaintiff's impairments and Residual Functional Capacity finding

Plaintiff argues that the ALJ did not adequately consider his headaches, chest pains, dizziness, and history of peptic ulcer disease[24] in determining that he had the residual functional capacity (RFC) to perform light work.[25] Plaintiff also argues that the ALJ failed to fully develop the record by seeking additional information from plaintiff's treating physicians.

A claimant's residual functional capacity (RFC) is the most that he can do despite his physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's

---

[24]The ALJ also did not address plaintiff's complaint of blurred vision. This complaint has bearing on the ALJ's determination that plaintiff could return to his past relevant work as a security guard supervisor, as he described the work. (Tr. 19). That job required plaintiff to drive from post to post for at least 3 hours of every 8 hour shift. Id.

[25]"Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. As relevant in this instance, a job is in this category if it involves a good deal of walking or standing. § 404.1567(b).

responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id. Because the ALJ did not consider plaintiff's well-documented history of headaches, dizziness, chest pains, and peptic ulcer disease in determining his RFC, the case must be remanded for further proceedings.

The defendant argues that these conditions are merely symptoms of plaintiff's underlying impairments – hypertension, diabetes, etc. – and that the ALJ was not required to consider their impact. Defendant's argument misses the point, which is he import of these conditions and all their symptoms on plaintiff's ability to work. See Ford v. Secretary of Health & Human Services, 662 F. Supp. 954, 956 (W.D. Ark. 1987), cited with approval, Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Plaintiff contends that the ALJ erred in failing to fully and fairly develop the record by requesting further information from the treating physicians. A social security hearing is a nonadversarial proceeding and the ALJ has the duty to fully develop the record. Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006); Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). While the ALJ must neutrally develop the facts, the ALJ need not seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); see also Smith, 435 F.3d at 930 (ALJ's "duty may include seeking clarification from treating physicians if a

crucial issue is undeveloped or underdeveloped). The ALJ is permitted to issue a decision without obtaining additional medical evidence so long as the evidence in the record provides a sufficient basis for the ALJ's decision. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).

As is discussed below, the ALJ determined that plaintiff's conditions were "quickly resolved" by medication. No medical provider has so stated and the Court finds that the evidence in the record is not sufficient to decide this point. On remand, the Commissioner should re-contact plaintiff's treating physicians for clarification of whether plaintiff's conditions can be managed by medication. 20 C.F.R. § 416.927(c)(3). Also missing from this record is what plaintiff's physicians recommend with regard to his RFC. Dixon v. Barnhart, 324 F.3d 997, 1003 (8th Cir. 2003); Nevland v. Apfel, 204 F.3d at 859 (record not "fully and fairly developed" where there was no medical evidence about how claimant's impairments affect RFC).

## 2.    The ALJ's credibility determination

In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions."

The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari,

274 F.3d 1211, 1218 (8th Cir. 2001). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, the ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. Where an ALJ explicitly considers the Polaski factors but then discredits the plaintiff's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).

In the present case, the ALJ found that medication controlled plaintiff's symptoms, that plaintiff did not regularly take his medication, and that his noncompliance was a prevailing factor in his recent hospitalizations. (Tr. 18). If an impairment can be controlled by treatment or medication, it is not considered disabling. Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

Medical records reflect that plaintiff's noncompliance with medication may have been a factor in two hospital admissions: May 24, 2004, (not May 24, 2005, as stated by the ALJ) and September 17, 2005. On the latter occasion, the physician described plaintiff's noncompliance as "inadvertent," secondary to lack of insurance. Plaintiff experienced four other hospitalizations for symptoms associated with uncontrolled blood pressure. Noncompliance with medication was not noted to be a factor on these occasions; indeed, on July 21, 2004, plaintiff stated that he had not missed any doses of his medication. Furthermore, his blood pressure remained elevated at the office visits immediately following his release from Forest Park Hospital with "corrected"

medications.   The ALJ's reliance upon an erroneous reading of the record undermines the conclusion that plaintiff's noncompliance with medication was a significant factor in his recent hospitalizations.  Baumgarten v. Chater, 75 F.3d 366, 368 (8th Cir. 1996)

The ALJ also discounted plaintiff's claim that he could not afford medication, noting that plaintiff testified that his wife worked long hours.   The ALJ concluded from that testimony that plaintiff's wife was a source of income and possible health insurance.   At the time of his hospital admission on September 5, 2005, plaintiff identified Medicaid as his insurance source; no secondary provider or guarantor appears.   There was no evidence regarding family income and expenses, or any record of the costs of plaintiff's medications.   On the present record, the ALJ's decision to discount plaintiff's claim that he could not afford his medications was based on unsupported assumptions and was therefore not reasonable.   See Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984) (an inability to afford treatment may excuse noncompliance).

The ALJ stated that plaintiff's symptoms "quickly resolve[d]" when he was compliant with treatment, medication, and diet.   It is improper for an ALJ to draw his or her own inferences from medical reports.   Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003). In this case, there are no notations that plaintiff ever missed scheduled appointments.   And, despite regular office visits, plaintiff's blood pressure remained elevated and he continued to report symptoms secondary to his diabetes, such as numbness or

tingling in his feet. Because the record does not contain any assessment by a medical professional that plaintiff's conditions were failing to resolve because he was noncompliant with treatment, the ALJ's conclusion was an unwarranted inference from the medical evidence.

The ALJ determined that plaintiff's activities of daily living were incompatible with a finding of disability. The decision noted that plaintiff "drives, shops, does the dishes, worked part-time, cooks, does laundry, attends church, and attends his . . . son's school-related activities." The ALJ's characterization overstates plaintiff's testimony and written statement: The evidence is that plaintiff drove to a nearby store about twice a week, and that he did not drive distances alone "due to constant dizziness." Plaintiff accompanied his wife to the grocery store about twice a month. He prepared meals about twice a week. He testified that he was able to do laundry, but he frequently required his son's help to lift the laundry basket. His wife often attended church without him because he did not feel well enough to go. He had attended two school-related activities: his son's high-school graduation ceremony and a choir performance. The ALJ's statement of plaintiff's daily activities is not supported by the record.

Even if the ALJ correctly characterized plaintiff's daily activities, the test is whether the claimant has the "ability to perform the requisite physical acts day in and day out in the sometimes competitive and stressful conditions in which real people work in the real world." <u>McCoy v. Schweiker</u>, 633 F.2d 1138, 1147

(8th Cir. 1982) (*en banc*)(abrogated on different grounds), <u>quoted in Draper v. Barnhart</u>, 425 F.3d 1127, 1131 (8th Cir. 2005). Evidence of performing housework does not preclude a finding of disability. <u>Id.</u> The Eighth Circuit has "repeatedly held . . . that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." <u>Baumgarten</u>, 75 F.3d at 369 (citation omitted).

The ALJ found that plaintiff had engaged in part-time work. Plaintiff testified, and his employer confirmed, that he did not work after August 2004. His employment was terminated effective January 31, 2005, when his FMLA leave benefits expired. A record dated July 11, 2005, shows that plaintiff's former employer paid him $1,892 in wages in the first quarter of 2005. (Tr. 138). However, an earnings report printed on November 30, 2005, indicates that plaintiff received no FICA earnings in 2005. (Tr. 132). The ALJ did not discuss the additional evidence and thus the conclusion that plaintiff engaged in part-time work is not supported by substantial evidence on the record as a whole.

The ALJ found that plaintiff's credibility was undermined because he had applied for unemployment benefits and, thus, necessarily had to indicate that he was willing and able to work.[26] Plaintiff testified that he applied for unemployment benefits when he was laid off in August 2004 but did not receive the benefits in

_____

[26]Plaintiff disclosed that he had applied for unemployment in his application for disability benefits. (Tr. 161).

the second quarter of 2005. An application for unemployment compensation is "some evidence, though not conclusive, to negate" a claim of disability. <u>Johnson v. Chater</u>, 108 F.3d 178, 180-81 (8th Cir. 1997), <u>quoting</u> <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1074 (8th Cir. 1991). Upon remand, the significance of plaintiff's unemployment application should be reconsidered in light of the evidence that the ALJ failed to take into account, including plaintiff's work record, which indicates sustained employment throughout most years of his adulthood. (Tr. 138-50).

### 3. **The ALJ's consideration of plaintiff's past relevant work**

The ALJ determined that plaintiff could return to his past relevant work as a security guard supervisor, which the ALJ found entailed completing reports and driving to each post to check up on the other guards. (Tr. 19). In his work history report, plaintiff also stated that the job sometimes required him to break up fights, run, and physically restrain suspects. (Tr. 205, 206, 210). The ALJ did not discuss these requirements of the job and did not address whether such activities were consistent with the finding that plaintiff could perform light work. The ALJ's determination that plaintiff could perform his past relevant work thus is not supported by substantial evidence. <u>See</u> <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 568 (8th Cir. 1999) (ALJ's decision that claimant can return to past relevant work must be based on more than conclusory statements).

### 4. **The ALJ's failure to obtain the testimony of a Vocational Expert**

Plaintiff contends that the ALJ was required to obtain the testimony of a vocational expert because the record establishes that he had significant nonexertional impairments.

The Medical-Vocational Guidelines (Guidelines) are a matrix of general findings, established by rule, as to whether work exists in the national economy that a claimant can perform, taking into account age, education, work experience, and RFC. By comparing individual factors for a particular claimant to the general findings in the Guidelines, the ALJ can determine whether other work exists in the national economy.[27]  See 20 C.F.R. § 404.1520 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

When a claimant suffers only from exertional impairments and the ALJ's findings of RFC, age, education, and previous work experience coincide with the Guidelines, the ALJ may rely exclusively on the Guidelines to determine whether other work exists in the national economy. 20 C.F.R. § 404.1569a(b); see also Heckler v. Campbell, 461 U.S. 458, 468 (1983) (concluding that the use of occupational Guidelines does not violate the Social Security Act and stating that "[t]his type of general factual issue may be resolved as fairly through rulemaking as by introducing the testimony of vocational experts at each disability hearing.").

---

[27] The Medical-Vocational Guidelines consist of three tables (for sedentary, light, and medium work) that may be consulted following a determination of RFC. The tables direct conclusions of disability or nondisability based on a claimant's age, education, and previous work experience. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 201-03 (2000).

The Guidelines, however, do not purport to establish jobs that exist in the national economy for claimants who also suffer from nonexertional impairments. <u>See</u> 20 C.F.R. § 404.1569a(c)(2). When a claimant suffers from exertional and nonexertional impairments, and the exertional impairments alone do not warrant a finding of disability, the ALJ must consider the extent to which the nonexertional impairments further diminish the claimant's work capacity. <u>Lucy v. Chater</u>, 113 F.3d 905, 908 (8th Cir. 1997), <u>citing</u> <u>Thompson v. Bowen</u>, 850 F.2d 346, 349 (8th Cir. 1988). If the nonexertional impairments significantly limit a claimant's ability to perform the full range of work described in one of the specific categories set forth in the guidelines, the ALJ is required to obtain the testimony of a vocational expert. <u>Reed v. Sullivan</u>, 988 F.2d 812, 816 (8th Cir. 1993).

Plaintiff contends that he suffers from the nonexertional impairments of chest pain and dizziness. In addition, he experienced headaches and blurred vision. The ALJ did not properly assess plaintiff's credibility with respect to these conditions. Upon reconsideration, if it is determined that plaintiff suffers from nonexertional complaints that significantly impair his ability to work, it will be necessary to obtain the testimony of a vocational expert.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate judgment in accordance with this Memorandum and Order shall be entered this same date.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 13th day of August, 2007.